AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of New York

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| **v.** | ) | |
| | ) | Case No.   5:17-MJ-194 (ATB) |
| KHALED AZZAM, and | ) | |
| VINCENT TESTA, | ) | |
| | ) | |
| | ) | |
| **Defendants** | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.  On or about the date(s) of in or about January 2016, through on or about May 4, 2017, in the county of Onondaga in the Northern District of New York the defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and 846; and | Conspiracy to possess with the intent to distribute and to distribute controlled substances; and |
| Title 18, United States Code, Section 1956(a)(2)(A) and (h) | Conspiracy to commit international money laundering |

This criminal complaint is based on these facts:
See attached affidavit

☒    Continued on the attached sheet.

_____
*Complainant's signature*

DEA Special Agent Anthony Hart
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   May 1, 2017
_____

_____
*Judge's signature*

City and State:   Syracuse, New York          Hon. Andrew T. Baxter, U.S. Magistrate Judge
_____          _____
*Printed name and title*

## AFFIDAVIT OF DEA SPECIAL AGENT ANTHONY HART

Anthony Hart, being duly sworn, deposes and says:

## I.      INTRODUCTION

1.      I am a Special Agent with the U.S. Drug Enforcement Administration of the U.S. Department of Justice (DEA) and been so employed since November 1999. I am currently assigned to the DEA Syracuse Resident Office, Syracuse, New York. I have participated in numerous successful investigations into illicit drug distribution networks and have interrogated numerous defendants, informants and others who were sellers, distributors, or users of narcotics and other illicit drugs. Also, I have been involved in the monitoring, intercepting and recording of court-ordered wiretaps, and have participated in numerous search warrants/arrest warrants involving narcotics trafficking. In addition to my above-mentioned experience, I have had the opportunity to speak with and observe other federal and state narcotics officers with regard to the manner in which narcotics are possessed, sold and distributed in the Northern District of New York area. I have participated in hundreds of searches of residences, businesses and vehicles in which controlled substances, drug paraphernalia, currency and records were discovered. My experience as well as conversations with other law enforcement officers, as detailed herein, will serve as the basis for any opinions or conclusions set forth below. I have personally participated in the investigation of the offenses set forth below and as a result of my participation and my review of past and present reports made by other Special Agents of the DEA, and other state and local law enforcement agencies, I am familiar with the facts and circumstances of this investigation. I have participated in several multi-agency narcotics investigations and have been the lead agent on narcotics investigations where heroin and synthetic drugs and analogues were predominantly distributed.

1

2.      I submit this affidavit in support of a criminal complaint charging defendants **Khaled AZZAM and Vincent TESTA** with conspiracy to possess with the intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C) and 846; and conspiracy to commit international money laundering, in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and (h).

3.      During the course of these investigations, I have conducted or participated in surveillance, undercover transactions, execution of search warrants, debriefings of informants and reviews of tape-recorded conversations and narcotics records.

4.      I have personally participated in the investigation of the offenses set forth below, which relate to the trafficking of cocaine. As a result of my participation in the investigation, my conversations with Special Agents of the DEA, agents, officers and investigators of other state and local law enforcement agencies, and my review of past and present reports made by others agents, officers, and investigators, I am fully familiar with the facts and circumstances of this investigation, the subjects of the investigation, and the related locations, including the location to be searched. My experience in the investigation of narcotics crimes, as well as my participation in the instant investigation, and conversations with other law enforcement officers, will serve as the basis for any opinions or conclusions set forth below.

## II.      BASIS OF INFORMATION

5.      As this affidavit is being submitted for the limited purpose of providing probable cause to support charging **Khaled AZZAM and Vincent TESTA** with conspiracy to possess with the intent to distribute controlled substances and international money laundering, I have not included each and every fact known to me concerning this investigation.  I set forth only the facts which I

believe are necessary to establish probable cause for the issuing a criminal complaint.

6.       The Drug Enforcement Administration and other federal, state, and local law enforcement agencies have intercepted cellular telephones in furtherance of this investigation.  On April 7, 2017, relative to this investigation, Honorable Glenn T. Suddaby, Chief United States District Court Judge for the Northern District of New York, signed an Order authorizing the interception of wire and electronic communications over (315) 640-5838 (SUBJECT TELEPHONE #1), utilized by **Khaled AZZAM**. In support of the government's application for authorization to intercept this cellular phone, your affiant submitted a 46 page affidavit outlining the narcotics investigation to date.[1]

7.       Significant evidence has been accumulated during this investigation through the use of the court authorized wire intercepts of the target cellular telephones.  Between April 7, 2017, until the present time, agents have intercepted multiple pertinent drug related calls between the subject interceptees (listed above in this affidavit) and other co-conspirators. In addition to the wiretap calls, surveillance operations have been initiated in conjunction with drug related pertinent calls involving the subject interceptees and their co-conspirators.  As will be discussed in further detail below, intercepted conversations over SUBJECT TELEPHONE #1 corroborate that **Khaled AZZAM** is involved in the day to day managing of this criminal organization responsible for the distribution of significant multi-kilogram quantities of fentanyl, fentanyl analogues, and other synthetic drugs and/or analogues that he is acquiring from sources of supply in China.

8.       From in or about November 2016, through on or about May 1, 2017, agents from the DEA Syracuse Resident Office (DEA-SRO) were conducting a separate investigation targeting a

---

[1] Interceptions are authorized through May 6, 2017.

3

significant heroin, fentanyl, and "Molly[2]" Drug Trafficking Organization operating in the Syracuse and Rome, NY areas. This case involved multiple Title III wiretaps of target telephones, authorized by the Honorable Glenn T. Suddaby, Chief United States District Court Judge for the Northern District of New York, as well as other traditional investigative techniques including controlled purchases of narcotics, vehicle and traffic stops, and search warrants of residences and businesses.

9.      On February 16, 2017, agents from the DEA-SRO and other law enforcement agencies executed multiple search warrants at a number of businesses and residences in relation to this investigation. Agents recovered two (2) kilograms of suspected "Molly," one-half (1/2) kilogram of suspected heroin, and one-half (1/2) kilogram of suspected fentanyl from a "stash location" in Syracuse known to be utilized by one of the targets of the investigation.[3]

10.      The individual that ran the aforementioned stash location was detained and interviewed following the execution of the search warrant. Following the waiver of his/her *Miranda* rights, this individual (hereafter referred to as CS#1) agreed to cooperate with law enforcement in exchange for consideration of his/her pending charges related to violations of Title 21, United States Code, Sections 841(a)(1) and 846.[4]

---

[2] "Molly" is a "street term" for MDMA and/or synthetic cathinone controlled substances or controlled substance analogues.

[3] To date, agents have received five (5) laboratory analysis reports from the DEA laboratory that show that the substances seized from the stash location include heroin, furanyl fentanyl, and no controlled substance, believed by your affiant to be a cutting agent mixed with narcotics that were seized at the stash location.

[4] Charges have not yet been filed against CS#1 in connection with his/her federal narcotics violations. It is anticipated that charges will soon be filed in U.S. District Court for the Northern District of New York. CS#1 was previously convicted of the following felony offenses: Criminal Possession of a Controlled Substance in the Fifth Degree on February 2, 2010, and sentenced to two (2) years' incarceration; Criminal Possession of a Controlled Substance in the Third Degree on

4

11.     CS#1 identified **Khaled AZZAM** as his source of supply for fentanyl and MDMA or "Molly." CS#1 stated he/she was supplied "Molly" by **Khaled AZZAM** and his brother Ali Azzam. CS#1 stated he obtained five (5) to six (6) kilograms of "Molly" per month from the **AZZAM's**. Initially, the **AZZAM's** charged CS#1 $6,000.00 per kilogram but the price went down to $1,500.00 per kilogram.

12.     CS#1 told law enforcement that **Khaled AZZAM** eventually provided him/her with the contact information for the "Molly" source of supply (SOS), located in China, enabling CS#1 to contact the Chinese SOS directly. CS#1 identified the "Molly" SOS as "Lily." CS#1 stated that he contacted "Lily" via Skype and provided her Skype name: "Apvpandethylone" to law enforcement. CS#1 further told agents that he/she initially provided local addresses (in the Syracuse, NY area) to **AZZAM** as to where to have "Lily" ship the packages of "Molly;" and later, once CS#1 was contacting "Lily" directly, CS#1 instructed her to ship the "Molly" to various addresses in the Syracuse area. CS#1 further told agents that he/she paid for the "Molly" via MoneyGram wire transfers to designated individuals in China. CS#1 stated he/she utilized associates to send them the narcotics proceeds in their name to the designated Chinese beneficiaries.

13.     On February 17, 2017, members of the DEA, including your affiant again interviewed CS#1 relative to several narcotics traffickers in the Syracuse area including **AZZAM**. CS#1 identified a "mug shot" of **Khaled AZZAM** as his fentanyl and "Molly" source of supply and provided **AZZAM's** telephone number (provided directly to CS#1 by **AZZAM**) as 315-640-5838

---

February 4, 2000, and sentenced fifty-four (54) months to nine (9) years' incarceration; Criminal Possession of a Weapon in the Third Degree on March 4, 1993, and sentenced to eighteen (18) months to three (3) years incarceration; and Attempted Criminal Sale of a Controlled Substance in the Third Degree on December 11, 1991, and sentenced to one (1) year incarceration. Since agreeing to cooperate with law enforcement in February 2017, CS#1's information has been found to be

(SUBJECT TELEPHONE #1). CS#1 stated that he/she previously obtained 800 grams of fentanyl from **AZZAM** for $25,000.00. CS#1 further stated that **AZZAM** was currently waiting on a shipment of at least a kilogram of fentanyl from China.

14.     On February 21, 2017, your affiant and other members of the DEA again met with CS#1 relative to this investigation. At the direction of agents, CS#1 placed a recorded call (made in the presence of your affiant thus enabling your affiant to observe CS#1 "dial" the numbers: 315-640-5838) to **AZZAM** at 315-640-5838 (hereinafter SUBJECT TELEPHONE #1) to discuss the status of the kilogram of fentanyl being shipped from China. In sum and substance, **AZZAM** advised CS#1 that he was still waiting for the kilogram of fentanyl to arrive from China and that it should arrive within the next ten (10) days or less. **AZZAM** advised CS#1 that he would let CS#1 know as soon as it arrived. A portion of the transcript follows:

AZZAM: It's looking like ten days.

CS#1: You said about ten days?

AZZAM: That's what it's looking like; hopefully less.

CS#1: If anything, just let me know.

AZZAM: ASAP.

15.     On March 17, 2017, CS#1 and **AZZAM** met at **AZZAM's** cellular telephone store, Metro PCS, located at 230 Grant Avenue, Auburn, NY. During the face-to-face meeting, **AZZAM** and CS#1 discussed the kilogram of fentanyl and its expected arrival date in Central New York. **AZZAM** told CS#1 that the fentanyl was likely going to arrive from China in the next couple of days. **AZZAM** agreed to provide at least a kilogram of fentanyl to CS#1, on consignment, with an agreed upon purchase price of $25,000 to be paid by CS#1 at a later date. Due to malfunctioning

truthful and reliable.                                    6

technical equipment, this conversation was not able to be recorded and was only monitored for a very brief period of time by Agent Wilson and Task Force Officer Edmonds.

16.      On or about March 20, 2017, **AZZAM**, utilizing **SUBJECT TELEPHONE #1,** called CS#1 to inform CS#1 that the fentanyl had arrived. Your affiant has obtained records from U.S. Postal Inspector Matthew Puro confirming a Priority Mail Express parcel from Honk Kong (Tracking # EA158342868HK) was delivered to 230 Grant Avenue, Auburn, NY on March 18, 2017 at 12:06 PM. The parcel was addressed to a "K. AZZAN" and was signed for by "Khaled AZZAN." They subsequently made tentative arrangements, via text messages, to meet at a Dunkin Donuts on North Salina Street, Syracuse, to conduct the transaction. Following are the text messages between CS#1 and **AZZAM** on March 20, 2017:

Outgoing text from CS#1 to **SUBJECT TELEPHONE #1** at 11:00 AM:  What's good bro? What time can I come check you?

Incoming text to CS#1 from **SUBJECT TELEPHONE #1** at 11:01 AM:  Any time before 5 I go to auburn at 5.

Outgoing text from CS#1 to **SUBJECT TELEPHONE #1** at 11:02 AM:  Ok cool where do you wanna catch up at?

Incoming text from **SUBJECT TELEPHONE #1** at 11:04 AM:  Dublin Donuts on north salina?  Im hanging at my cuz store on division.

Outgoing text from CS#1 to **SUBJECT TELEPHONE #1** at 11:07 AM:  Where is that next to? Idk where donut ship at.

Incoming text from **SUBJECT TELEPHONE #1** at 11:08 AM:  Dunkin Donuts North Salina. How long u need?

Outgoing text from CS#1 to **SUBJECT TELEPHONE #1** at 11:09 AM:  Lol.  I know dunk donut.  I just tying up things and I'll be heading your way I will hit you when I'm almost there.

Incoming text from **SUBJECT TELEPHONE #1** at 11:09:  OK.

Outgoing text from CS#1 to **SUBJECT TELEPHONE #1** at 2:24 PM:  See u in a lil bit.

Incoming text from **SUBJECT TELEPHONE #1** a 2:24 PM:  OK.

17.     CS#1 arrived at the DEA-SRO that afternoon to receive additional instructions regarding the meeting with **AZZAM**. At that time, case agents reviewed CS#1's telephone and took pictures of all the above-referenced text messages. Prior to the meeting with **AZZAM**, CS#1 was searched for additional monies and contraband and fitted with a recording device; CS#1's vehicle was also searched and CS#1 was followed by agents to the agreed upon meeting location (Dunkin Donuts on North Salina Street, Syracuse).

18.     Upon arrival at the meeting location, CS#1 met with **AZZAM** in **AZZAM's** vehicle. During the meeting, **AZZAM** and CS#1 had a lengthy recorded conversation discussing the fentanyl quality and significant details about the shipment of the fentanyl from China to **AZZAM's** cell phone store in Auburn. AZZAM told CS#1 in sum and substance that the package had been delivered to his store and he left on the counter all day because he was scared to touch it. Among other details, **AZZAM** told CS#1 that **"LENTO" (Luis Rosario)** had previously purchased four (4) kilograms of fentanyl from him and that **AZZAM** sold one-half (1/2) kilogram of fentanyl to his "barber."

19.     At approximately 3:23 P.M. surveillance agents observed **AZZAM** place a black "pelican case" into the trunk of CS#1's vehicle. Agents observed **AZZAM** getting back into his vehicle and then observed CS#1 returning to his/her vehicle. Both CS#1 and **AZZAM** departed the area in their respective vehicles and CS#1 was followed to a pre-determined meet location. Agents conducting surveillance attempted to follow **AZZAM** following the transaction, however due to his erratic driving, agents lost sight of **AZZAM** following the meeting with CS#1. The substance in the "pelican case" was seized by agents and then transported to the DEA laboratory for analysis. The laboratory analysis showed that the substance (weighing 1,501.6 net grams) **AZZAM** provided to

CS#1 on consignment, which **AZZAM** claimed was fentanyl was, in fact, U-47700[5], a Schedule I synthetic opioid. Your affiant is aware, based upon his training and experience, that U-47700 is predominantly manufactured in China.

### ONE KILOGRAM SEIZURE OF DIBUTYLONE[6] ON APRIL 12, 2017

20.     Shortly after initiation of the wiretap on SUBJECT TELEPHONE#1, agents began intercepting calls that indicated **AZZAM** was expecting a parcel which had been shipped from China through the shipping company DHL.  Agents learned that the parcel was mistakenly sent to Rochester, NY.  On April 12, 2017, case agents were able to respond to the DHL package facility and secure the parcel.  Located in the parcel was approximately one (1) kilogram of a pink rock like substance in a plastic dog food bag.  The substance was tested using an electronic narcotics testing device and it tested positive for the substance dibutylone, a synthetic cathinone added to the list of Schedule I controlled substances on March 7, 2014.

21.     The intended recipient on the parcel was a "Casey Teste" at "140 Brooklyn Road, Syracuse, NY," which your affiant believes is an alias for **Vincent TESTA** and a typographical error for **TESTA's** actual address of 140 Brookfield Road, Syracuse.  The sender was listed as "Hua Bei Tarding Co LT," and the bill of lading indicated that the contents of the package was an "LED

---

[5] On November 14, 2016, the Administrator of the Drug Enforcement Administration placed 3,4-dichloro-$N$-[2-(dimethylamino)cyclohexyl]-$N$methylbenzamide (U-47700), a synthetic opioid, into Schedule I of the Controlled Substances Act (CSA), pursuant to 21 U.S.C. § 811(h).  *See* 81 Federal Register, Number 219 at 79389-79393 (Monday, November 14, 2016).

[6] On March 7, 2014, the Administrator of the Drug Enforcement Administration placed 1-(1,3-benzodioxol-5-yl)-2-(methylamino)pentan-1-one (also known as pentylone), as well as its optical, positional, and geometric isomers, salts, and salts of isomers, into Schedule I of the Controlled Substances Act (CSA), pursuant to 21 U.S.C. § 811(h).  Dibutylone is a positional isomer of pentylone.  *See* 79 Federal Register, Number 45 at 12938-12943 (Friday, March 7, 2014).

Lamp."

22.     After agents seized the parcel, multiple calls were intercepted between **AZZAM**, on

SUBJECT TELPHONE #1, and representatives from DHL. During this series of calls, **AZZAM** tried

numerous times to have the package delivered to 140 Brookfield Road, Syracuse, NY.  **AZZAM**

identified himself as "Casey Teste" (the addressee name on the package) and purported to DHL

representatives he was the intended recipient of the package at the intended location.  Agents have

been able to determine that **Vincent TESTA** lives at this address (140 Brookfield Road) and,

through additional intercepted calls, agents have determined that **AZZAM** had ordered the drugs

from the Chinese supplier on **TESTA's** behalf.

23.     On April 11, 2017, at 6:28 PM, **AZZAM** (KHALED), utilizing SUBJECT

TELEPHONE #1, placed an outgoing call (Call#342) to DHL (KELLY) at 1-800-225-5345.  A

transcript of the call follows:

KELLY:     Hello.  This is Kelly.  How can I assist you today?

KHALED:     How are you doing?  I'm, um, currently waiting for a parcel and, um, it says that

address information it's needed, contact DHL.

KELLY:     I'll be able to waybill for you.  What's the tracking number?

KHALED:     The [U/I] number is 9-7-6 [Pause] 4-7-3 [Pause] 4-8-0-3.

KELLY:     May I have your name?

KHALED:     Casey [PH].

KELLY:     [Audio distorts] you shipment is coming from Hong Kong?

KHALED:     Yes!

KELLY:     Mm, is showing undeliverable due to a bad address.  What is the correct delivery

10

                  address, Casey?

KHALED:       What?  Uh, I'm sorry.  What, why does it say it was, uh, undeliverable?

KELLY:           It's showing uh, undeliverable 'cause a bad address.

KHALED:       It's not...

KELLY:           What's the...

KHALED:       ... a bad address.  It's, um, it's, uh, it's in Syracuse.  That's why I don't know why is in Rochester

KELLY:           [Audio distorts] what's the correct address?  [Audio distorts]  [Audio glitch]  [U/I] are you still there?

KHALED:       [Audio distorts]   Yeah, I'm here.  Didn't you hear me?  [Pause]  Hello?

KELLY:           Yes!  What is the correct address?

KHALED:       It's 140 Brookfield.   [Audio distorts]  That's in Syracuse.

KELLY:           Brookfield?

KHALED:       Brookfield; b-r-o-o-k, field, f-i-e-l-d.  One word.

KELLY:           Yeah.  We got 140 Brooklyn [PH] road.

KHALED:       No!  It's Brookfield!  Brookfield!

KELLY:           And that's, uh, 1-3-2-1-1?

KHALED:       Yes ma'am!

KELLY:           Okay.  Well, I got that corrected in our system and ready to go up for delivery again
tomorrow.

KHALED:       Thank you very much.

KELLY:           Anything else I can assist you with?

KHALED:       All set, thanks, darling.

KELLY:           Uhm-hum.  Thanks from DHL.  Have a good day.

KHALED:      You too.  Bye, bye.

[End of conversation]

24.    On April 11, 2017, **AZZAM** placed an outgoing call (Call# 343) at 6:59 PM, to DHL

at 1-800-225-5345 from SUBJECT TELEPHONE #1.  A transcript of the call follows:

DHL REPRESENTATIVE:  Thank you for calling.  This is Sheemond [PH] speaking.  How may I
help you today?

KHALED:  Hi, um, [Audio glitch] I spoke with somebody a little while ago.  Uh, because it says
that, uh, tracking, the, um, my address was, it said it was invalid or something.   So, I called them
and I changed it but there's no update on the, on the site.  And I live in Syracuse and the package is
in Rochester and it doesn't make sense.

DHL REPRESENTATIVE:  I'll take a look.  Um, your name, sir?

KHALED:  Casey.

DHL REPRESENTATIVE:  [Audio distorts] And, Casey, what's the tracking number?

KHALED:  Uh, one (1) second.  The tracking number is 9-7-6-4-7-3-4-8-0-3.

DHL REPRESENTATIVE:  Thank you.

KHALED:  You're [Audio distorts] welcome.

DHL REPRESENTATIVE:  Take a look here.  [Pause] [Audio distorts] [Sighs] Okay, it looks like
it is currently in Syracuse.  I'm looking at the facility here, um, so it is going to be out for re-delivery
tomorrow if I can change the address.  Is that correct?

KHALED:  Uh, right.  Uh, why is, what's, what does the actual address say?  I, uh, I don't understand.

DHL REPRESENTATIVE:  Um, the address I have, Let's see.  The one I have in the system is 1-40
Brooklyn [PH] road with that, uh, it looks [U/I] delivery to the business address?

KHALED:  No, it's, uh, it's a residential address and I have had packages sent there but this is the first
time they sent DHL.

DHL REPRESENTATIVE:  Okay.  And, it's 1-40 Brooklyn Road Syracuse?

KHALED:  No!  It's 1-40 Brookfield road.  B-r-o-o-k-f-i-e-l-d road.  And, that's, uh, 1-3-2-11

DHL REPRESENTATIVE: Okay. Let me go ahead and update the system. I don't see, um, that you went and did that properly. So, let me go ahead and, and make sure that's done properly for tomorrow's delivery.

KHALED: Yeah, please.

DHL REPRESENTATIVE: Alright.

KHALED: Can I go try to pick it up from the, from the actual facility?

DHL REPRESENTATIVE: Um, you can...

KHALED: ...in Syracuse right now?

DHL REPRESENTATIVE: It is.

KHALED: What time are you going to be opened until?

DHL REPRESENTATIVE: Well, it's not back in yet [Unintelligible]

KHALED: If they can still deliver that would be awesome because, you know, I'm not that far. I'm in North Syracuse, right next to everything.

DHL REPRESENTATIVE: Okay. [Audio distorts] [Pause] [Sighs] Yeah, um, this is actually this late in the afternoon the [Unintelligible] the courier still has it, um, but I          can re-delivery. He is going to be taking it back to the facility.

KHALED: Okay, okay, as long as, as long as you guys have the right address for me. [Unintelligible]

DHL REPRESENTATIVE: Yeah, let me go ahead, let me update it so he can get it out to you tomorrow properly here [Unintelligible]. And, uh, Casey, what's your phone number, sir?

KHALED: 3-1-5-6-4-0-5-8-3-8.

DHL REPRESENTATIVE: Thank you.

KHALED: Yeah!

DHL REPRESENTATIVE: To 1-4-0, 1-4-0 Brookfield?

KHALED: 1-40 Brookfield. Yes, b-r... one word, B-r-o-o-k-f-i-e-l-d road.

DHL REPRESENTATIVE: Hum, uh, Syracuse? 1-3-2-0-1?

13

KHALED: Yes, 1-3-2-1-1

DHL REPRESENTATIVE: Thank you.  I'll go ahead and update that for you so we can get that to the right, uh, location.  Aright.
KHALED: Will it update, uh, will it update in my tracking as well?

DHL REPRESENTATIVE: It will.

KHALED:  Okay awesome.  Aright, so I can [Unintelligible] on the other side to do it. [Audio distorts]  Oki doki [PH].  Thanks a lot, man.

DHL REPRESENTATIVE: No problem.  Any other question, Casey?

KHALED: All set.  I appreciate it.  [Unintelligible] bye-bye.

[End of conversation]

     25.     On April 11, 2017, at 8:15 PM, **AZZAM**, utilizing SUBJECT TELEPHONE #1,

placed an outgoing call (call # 347) to 1-800-225-5345 (DHL).  A transcript of the call follows:

KELLY: Hello, this is Kelly.  How can I assist you today?

KHALED: Hello, uh, I have a, um, I have a package being sent to me and uh, it says that, "address information needed, contact DHL."   But I already spoke to somebody, but it still says      that.

KELLY: [Unintelligible] for you.  What's the tracking number?

KHALED: The tracking number is, 9-7-6 4-7-3-4-8-0-3.

KELLY: Uh-hum.  May I have your name?

KHALED:  Casey.

KELLY: And this is a shipment coming from Hong Kong?

KHALED: Yes.

KELLY: Yeah.  It looks like we spoke to you right after that they tried to make that delivery so we do have the updated address now; we will deliver there tomorrow.

KHALED: Okey dokey.  Thank you.  I just wanted to verify that because it still showed on the tracking.

KELLY:  Anything else I can assist you with?

KHALED: All set.  Thank you very much.

KELLY: Thanks from DHL.  Have a good day.

KHALED: You too.  Bye-bye.

[End of conversation]

26.     On April 12, 2017, SUBJECT TELEPHONE #1, utilized by **AZZAM** (KA), placed an outgoing call (#363) at 11:51 AM to 315-760-1525, utilized by **Vincent TESTA** (VT).  A transcript of the call follows:

VT: Yo.

KA: Where are you at?

VT: Ah, I am about to be at Home Depot on Bridge Street.

KA: Damn. Home Depot on Bridge, fuck!

VT: Why?

KA: Oh gosh, man. DHL is giving me some issues right now, man. I don't know what it is, man, but I just got off the phone with them.

VT: What they said?

KA: They said that the shipper contacted the DHL and ask for its return. But I am talking to the shipper right now and he said, "We didn't contacted DHL." So contacted, I spoke to a manager-supervisor at DHL and ah, they're putting an expedited, an expedited investigation into it and they are calling me back within the next three hours so I will know exactly what the fuck is going on, or they are not returning my shit!

VT: I don't understand, why why this is, what, I don't get it.

KA: I don't understand that either, man. Where are you at? Meet me up I am on fucking ah, Teall Ave.

VT: OK. Hey, I'm on, I got to drop off this equipment off, man. I'm about to be at Home Depot, my nigga. [Audio glitch] so meet me up at Home Depot on Bridge street, like I said.

15

KA: Ok.

[End of conversation]

27.     On April 13, 2017, SUBJECT TELEPHONE #1, utilized by **AZZAM** (KHALED),

received an incoming call (#73) from 315-760-1525, a cellular phone used by **Vincent TESTA**

(VT). A transcript of the call follows:

KHALED: Hello.

VT: Where are you at?

KHALED: Where are you at?

VT: I am leaving the gym, fag.

KHALED: I'm uh, I'm on the north side.

VT: They called you back? You called them? What?

KHALED: Yeah, man. Meet me up with me, man, meet up with me.

VT: No. Just tell me now 'cause if I meet up with you and you tell me bad news, I'll probably going to smack you.

KHALED: Well, I don't really know, I don't really know, man. I don't really know.

VT: What do you mean you don't know? You talked to them yesterday so what the lady say today?

KHALED: Well, man, they are all confuse, man.

VT: What?

KHALED: [U/I]

VT: What?

KHALED: I don't know, man, I don't know.

VT: Yo, listen listen, you need to answer the question.

KHALED: I don't know.

VT: Why do you mean you don't know. You don't know is not an answer, bro.

KHALED: I don't know; I just spoke to the connect and they want, they want you to send them uh, they want you to send them $300.00 ah, resend it.

VT: They want what?

KHALED: They want $300.00 for you to send.

VT: I am not sending them shit! What the fuck you mean?

KHALED: I don't know.

VT: Fuck, I need to send them $300.00 for it if they already send the package, bro?

[End of conversation]

## MEETING BETWEEN AZZAM AND CS#1 ON APRIL 18, 2017

28.     As discussed above in ¶¶19-24, on March 20, 2017, **AZZAM** provided approximately one and one-half (1.5) kilograms of U-47700 (a Schedule I controlled substance) to CS#1 on consignment.  On April 18, 2017, CS#1 met with **AZZAM** to provide partial payment for the one and one-half (1.5) kilograms of U-47700, which had previously been fronted to CS#1 by **AZZAM**. CS#1 and **AZZAM** made arrangements to meet at the Pilot Truck Stop on 7th North Street, Liverpool, NY.  Prior to the meeting, CS#1 was searched and provided with $10,000.00 in official DEA funds. CS#1 was also fitted with a recording device prior to the meeting.  A short time later, **AZZAM** was observed in the parking lot of the Pilot Gas Station by surveillance agents. CS#1 met with **AZZAM** in the parking lot and gave the $10,000.00 to **AZZAM**. During this transaction, CS#1 and **AZZAM** engaged in a lengthy conversation, which was monitored and recorded by agents.

29.     During the conversation, **AZZAM** admitted to CS #1 that the Chinese source of supply was now shipping packages via DHL because DHL (as opposed to the USPS—the prior shipper) only takes two or three days to deliver packages shipped from China.  **AZZAM** stated that

17

he had his packages [containing synthetic drugs] shipped to his mother's residence and that he (**AZZAM**) can't be caught [by law enforcement]. **AZZAM** further told CS#1 that he (**AZZAM**) had purchased "five of them" [believed to be five (5) kilograms of synthetic drugs] from the source and that they were all on the way. **AZZAM** stated that he got a ten (10) gram sample last week from his Chinese source, shipped via DHL. **AZZAM** told CS#1 that the sample doesn't look like the powder he previously provided to CS#1 (a reference to the 1.5 kilograms of U-47700).

## TWO KILOGRAM SEIZURE OF DIBUTYLONE ON APRIL 20, 2017

30.     Given the information gleaned from the meeting between **AZZAM** and CS#1 (described above), agents contacted DHL representatives to learn if there were any additional parcels that had been shipped from China to addresses utilized by **AZZAM** or **TESTA**. On April 19, 2017, agents were contacted by DHL representatives who advised that two (2) packages were in-transit from China and would be held at their sorting facility for law enforcement inspection. The names and addresses identified of the shipper and receiver of the parcels were as follows:

A)     The shipper was listed as "Ping Fan Tarding CO LT, NO 64 Banban Road, Pujiang County, Hong Kong, HK." The parcel recipient was listed as "Kale AZZAM, 7546 Plum Hollow Circle, Liverpool, NY 13090."

B)     The shipper was listed as "Ping Fan Tarding CO LT, No 41 Sha Chan, Industrial Zone, Hong Kong, HK." The parcel recipient was listed as "METRO PLCS, 230 Grant Avenue, Auburn, NY 13021."

31.     Both packages were described in the DHL waybill as "LED Lamp;" valued at $12.00; and both packages listed the shipping account number as 631147628, with the same contact telephone number for the shipper.

18

32.     On April 20, 2017, at approximately 11:30 AM, agents arrived at the DHL facility, in Rochester, New York and secured the two parcels.  Located in each of the parcels was one (1) kilogram of a rock like chunky substance pinkish red in color. Agents utilized a handheld TruNarc Narcotics Analyzer to identify the substance. The TruNarc scan showed the presence of dibutylone which your affiant is aware is a Schedule I controlled substance.  The two (2) kilograms of dibutylone were seized by agents and sent to the DEA laboratory for furher testing.

33.     On April 20, 2017, at approximately 12:57 PM, SUBJECT TELEPHONE #1, utilized by **AZZAM,** received an incoming call (#173) from 315-760-1525, utilized by **Vincent TESTA**. During the call, **TESTA** (VINCENT) and **AZZAM** (KHALED) discuss a package that was en-route, via DHL, to **TESTA's** address.  A transcript of the call follows.

KHALED: [Inaudible]

VINCENT:  Yo, faggot.

KHALED:  What?

[BACKGROUND:  CAR DOOR CHIMES]

VINCENT:  What, what name did you put this one on?

KHALED:  Anthony Vita.

VINCENT:  You gotta send it to me because I gotta find this paper.  Yo!  You should've told me that when I called you the first time, when I called these people.  I called them fuckin' people to try to reschedule and I'm like, "Yo, I need to reschedule." "Oh, what's the name?"  I tell her fuckin', "Casey Chesty Nut" or whatever the fuck you put!  And, they were like, "Oh, that one got sent back to the manufacturer or whatever."  I'm like, "A'right, well I have another tracking number and it's not right."  She's like, "Well, just sign the paper on number two and, um, the, they will come drive, they, they'll come, 'cause this paper I got at my store says, 'It will probably get there Friday.'"  And sh [PAUSE] and on number two I can sign it now and, and, and everything and uh [PAUSE] and leave it at my door and they will just drop it off instead of me being [PAUSE].

KHALED:  Oh, you got, you got to call and fuckin' ask for the reschedule.

19

VINCENT: No wait, bro, I'm looking at the paper right now. I'll send you a picture of it if you want.

KHALED: You gotta retry that Sunday. Oh, okay, a'right. That's what she [PAUSE]

[VOICES OVERLAP]

VINCENT: It says, it says, "We try to deliver at the time at the day, blah, blah. We will try again on Friday," which is tomorrow, "the twenty first." And, it says down here, it says, "sign the DH" [PAUSE] It says, "it, it requires a signature for delivery. If you're unable to attend or to be there, sign the DHL to leave this package, on number two box, signing this it will authorize the DHL packager or the, uh, the deliverer to leave the package without you being attended."

KHALED: Nice!

VINCENT: [SIGHS] so, that's what I'm gonna do. But, I just need the name. So, send it to me, fag.

KHALED: A'right, a'right.

[END OF CONVERSATION]

34.     On April 20, 2017 at approximately 1:06 PM, **TESTA** using 315-760-1525 sent a text (#832) to SUBJECT TELEPHONE #1: "Send it fag. I gotta get back to the job." At approximately 1:14 PM, **AZZAM** using SUBJECT TELEPHONE #1 sent an outgoing text to **TESTA** at 315-760-1525: "Anthony vita." Your affiant is aware that Anthony Vita has been incarcerated since March 2016 and recently pled guilty, before Senior United States District Court Judge Norman A. Mordue, to distributing heroin laced with fentanyl to a pregnant female victim resulting in her death.

35.     Given the aforementioned intercepted phone calls and text messages on SUBJECT TELEPHONE #1, your affiant established surveillance at **TESTA's** residence (140 Brookfield Road) on April 21, 2017. At approximately 12:00 PM, your affiant observed **TESTA's** black BMW parked in the driveway of 140 Brookfield Road, Syracuse, NY. At approximately 12:10 PM, your affiant observed a yellow DHL truck pulling off of Brookfield Road. Approximately 10 minutes later, a white SUV was observed by your affiant parked in front of 140 Brookfield Road. Your affiant

20

squared the block of the residence and upon returning to the area of the residence, the white SUV had left the area. At approximately 12:45 PM, your affiant observed a white SUV, similar to the one observed in front of 140 Brookfield Road, parked in the driveway of 7546 Plum Hollow Circle (the known residence of **AZZAM**). The vehicle is registered to Mohammed AZZAM at 7546 Plum Hollow Circle, Liverpool, NY.

36.     Your affiant was able to confirm with DHL personnel that a 1.5 kilogram package was delivered to 140 Brookfield Road, Syracuse, NY on April 21, 2017, at approximately 12:05 PM. The recipient of the parcel was "Anthony Vita." The shipper was identified by DHL as "Du Ling Trading CO LT, Room 1339, Hong Xuan Building 25, Street Shixia N Rd, Hong Kong." The account number for the parcel was the same account number previously listed for the other seized parcels (referenced above).

37.     On April 27, 2017, your affiant was contacted by U.S. Postal Inspector Matthew Puro relative to international packages shipped via the U.S. Postal Service to addresses involved in this investigation. According to Inspector Puro, I.P address 71.176.113.192 tracked two (2) domestically shipped parcels, which were addressed to 7546 Plum Hollow Circle, Liverpool, NY (**Khaled AZZAM's** address). Between February and April 2017, the same I.P. address tracked seven (7) additional parcels that had been shipped from Hong Kong or mainland China to addresses in Central New York. One of these parcels (tracking number EA158342868HK) shows that the package was accepted and signed for by "Khaled Azzan" in Auburn, NY. The same IP address also tracked an inbound parcel (tracking number LK131063431HK) which was delivered by the USPS to an address on Brookfield Road in Syracuse, NY. An additional parcel tracked by the same IP address (tracking number EA169363118CN) shows that the parcel was mailed from China and arrived in the United

States. According to Inspector Puro, the parcel appears to have not left U.S. Customs inspection yet for presentation to the USPS for processing and delivery.

## EXECUTION OF SEARCH WARRANTS

38.     On May 1, 2017, your affiant sought and obtained search warrants from United States Magistrate Judge Andrew T. Baxter to search **AZZAM's** residence, located at 7546 Plum Hollow Circle, Liverpool, NY, **AZZAM's** business, located at 230 Grant Avenue, Auburn, NY, as well as **TESTA's** residence, located at 140 Brookfield Road, Syracuse, NY.  During the early morning hours of May 4, 2017, agents executed the search warrants.  **AZZAM and TESTA** were both arrested at their respective residences during the execution of the warrants.

39.     Agents recovered miscellaneous documents, cellular telephones[7], i-Pads, and a hard plastic Pelican Case from 7546 Plum Hollow Circle, Liverpool, NY.  From 230 Grant Avenue, Auburn, NY, agents recovered two computers, miscellaneous documents, and five cellular phones. From 140 Brookfield Road, agents recovered a quantity of United States currency, miscellaneous paperwork, two (2) baggies of suspected cocaine, a bag of suspected marijuana, digital scales, and ammunition.

40.     Following **TESTA's** arrest, he was advised of his *Miranda* rights, which he waived, agreeing to speak with agents.  Your affiant and other agents also interviewed **TESTA** at the DEA office later in the morning.  In sum and substance, **TESTA** stated the following:

41.     **TESTA** met **AZZAM** during the summer of 2016 through mutual friends at a local poker house.  At some point thereafter, **AZZAM** came to **TESTA** with a proposition that he (**AZZAM**) was looking for individuals to wire money to China and to receive parcels at local

---

[7] SUBJECT TELEPHONE #1 was recovered in **AZZAM's** bedroom.

addresses in the Syracuse metro area.  **AZZAM** agreed to pay **TESTA** to wire the money and to receive parcels at his residence.  **TESTA** stated that the agreement was **AZZAM** would pay him $500.00 each time **TESTA** wired the money to China and $500.00 each time **TESTA** received the parcel (of drugs) at his address.  **TESTA** would then provide the package of drugs to **AZZAM**. According to **TESTA**, he did this four (4) or five (5) times at **AZZAM's** request.

42.     According to **TESTA**, in or about February 2017, **AZZAM** confided in **TESTA** that the substance that was being sent from China was in fact "Molly."  **AZZAM** told **TESTA** that he corresponds with the Chinese source of supply for "Molly" through the "Dark Web." In addition to wiring money to China, **AZZAM** informed **TESTA** that he also used "Bit Coins" to pay for shipments of controlled substances.  **TESTA** informed your affiant that **AZZAM** makes between $5,000.00 and $7,000.00 for each kilogram of "Molly" that he sells.

43.     In late April 2017, **AZZAM** and **TESTA** had a falling out after **AZZAM** arranged to have a package of "Molly" sent to **TESTA's** residence without **TESTA**'s knowledge.  **TESTA** was upset over this and ordered **AZZAM** not to use his address any longer for shipment of drugs. **TESTA** found out a parcel was coming to his residence after he came home one evening and saw a DHL sticker on his door.  **TESTA** called the DHL office and then called **AZZAM** to confirm what name **AZZAM** had used for the parcel.  (Agents intercepted this call over SUBJECT TELEPHONE #1 and it is referenced above).

44.     **TESTA** ultimately made arrangements with DHL to have the package sent to this house the next day, April 21, 2017.  Your affiant confirmed with DHL personnel that this parcel was, in fact, delivered to 140 Brookfield Road.  According to **TESTA**, this was the last parcel of drugs he accepted at his residence for **AZZAM**.

23

## FINANCIAL INVESTIGATION

45.     Wire transfer information to China has been obtained by your affiant from Western Union and Money Gram via subpoena.  Multiple wire transfers were identified as being sent by **Khaled AZZAM**, his immediate family members, and **Vincent TESTA**.  The wire transfers were sent, or caused to be sent, to businesses and entities in China totaling over $40,000.00. Your affiant believes, based upon his training, experience, and knowledge of this investigation, that this currency was sent to pay for controlled substances (such as U-47700, dibutylone, fentanyl, and furanyl fentanyl).

**III.**     **CONCLUSION**

46.     I believe the foregoing establishes probable cause to believe that **Khaled AZZAM and Vincent TESTA** conspired to possess with the intent to distribute controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C) and 846, and conspiracy to commit international money laundering, in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and (h).  I respectfully request that the Court authorize the filing of this complaint so that the defendants may be charged and brought to court for further proceedings in accordance with the law.

Respectfully submitted,

Anthony Hart, Special Agent
Drug Enforcement Administration

Subscribed and sworn to before
me this 4th day of May 2017

Hon. Andrew T. Baxter
United States Magistrate Judge

24